UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Donald R. Navarre,

    Plaintiff,

v.                                                     Civil No. 06-1558 (JNE/SRN)
                                                   ORDER

White Castle System, Inc.,

    Defendant.

---

Kathyrn M. Engdahl, Esq., Metcalf, Kaspari, Howard, Engdahl & Lazarus, P.A., appeared for Plaintiff Donald R. Navarre.

Robert R. Reinhart, Esq., and Brittany Mayer, Esq., Dorsey & Whitney LLP, appeared for Defendant White Castle System, Inc.

---

This is an action by Donald Navarre against his former employer, White Castle System, Inc. (White Castle). Navarre claims that White Castle discriminated and retaliated against him in violation of the Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA). He also asserts claims of assault and battery. The case is before the Court on White Castle's Motion for Summary Judgment. For the reasons set forth below, the Court grants in part and denies in part White Castle's motion.

## I.     BACKGROUND

White Castle operated a store in Coon Rapids, Minnesota. The store's employees worked three shifts. The first started at 7:00 a.m.; the second at 3:00 p.m.; and the third at 11:00 p.m. Debra Nieman was the store's General Manager. Holly Westermann was the Assistant General Manager and second-shift manager. Kenneth Bueltel managed the third shift.

In December 2004, Navarre applied to work at the White Castle in Coon Rapids. According to Navarre's deposition testimony, Nieman and Westermann interviewed him shortly

1

after he had applied, and Navarre informed them that he had attention deficit hyperactivity disorder and Tourette's syndrome.  At her deposition, Westermann stated that she was not present at Navarre's interview.  White Castle hired Navarre, and he started to work on December 19.  At Navarre's request, White Castle assigned him to the third shift.  Navarre completed his training by February 1, 2005.

According to Navarre's deposition testimony, Bueltel verbally harassed Navarre each day they worked together and occasionally subjected Navarre to physical harassment from the completion of Navarre's training until the termination of Navarre's employment in late April 2005.  Bueltel disputes many of the alleged instances of harassment.  The harassment allegedly continued despite Navarre's repeated objections and statements of his disability.  Navarre eventually told Westermann about the alleged harassment.

After learning of the alleged harassment, Westermann informed Nieman of Navarre's concerns about Bueltel.  Nieman later reprimanded Bueltel.  Westermann also suggested to Navarre that he work on the second shift.  According to Westermann, Navarre agreed to move to the second shift.  Navarre testified that he tentatively agreed to work the second shift: "I told [Westermann] that I could try [the second shift] but I'm not really sure about it.  I can get back to [her] and let [her] know if I'd be willing to work second shift."  White Castle scheduled Navarre for the second shift.  Navarre later informed Westermann that he would not work the second shift because it was too busy.  In response, Westermann allegedly told Navarre that his decision "was okay" and that she understood his concerns about working the second shift.  The change to Navarre's schedule nevertheless remained.

At about the same time that Navarre informed Westermann of the alleged harassment by Bueltel, Navarre's mother, having been informed of the harassment, called White Castle and

2

spoke to Westermann and Nieman on separate occasions. According to Navarre's mother, Nieman reacted angrily to the call. Nieman denied having a telephone conversation with Navarre's mother but acknowledged learning of Westermann's conversation with Navarre's mother.

Shortly after Navarre's mother's calls to White Castle, Navarre had a conversation with Nieman at the end of his shift about cleaning the parking lot. According to Navarre, Nieman also mentioned his mother's telephone calls to White Castle during the conversation. Nieman allegedly asked Navarre why he went "home crying to [his] mommy." At her deposition, Nieman denied making this statement. After this conversation with Nieman, Navarre did not return to work at White Castle. He left before his move to the second shift took place.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     ADA**

*1.     Harassment*

Navarre claims that White Castle violated the ADA by harassing him because of his disability. The ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2000). Under section 12112(a), a plaintiff can assert a claim based on a hostile work environment. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003). To prevail, the plaintiff must show: (1) his membership in the class of people protected by the ADA; (2) he experienced unwelcome harassment; (3) the harassment resulted from his membership in the protected class; and (4) the harassment was so severe as to affect the terms, conditions, or privileges of his employment. *Id.* at 720.

According to White Castle, Navarre does not belong to the class of people protected by the ADA because he is not disabled. An individual is disabled if (1) he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (2) he has "a record of such impairment"; or (3) he is regarded "as having such an impairment." 42 U.S.C. § 12102(a)(2) (2000); *see Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1093 (8th Cir. 2007). "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).

Navarre maintains that he was regarded as having mental impairments that substantially limited the major life activities of thinking and concentrating. *See Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006). According to Navarre's deposition testimony, Bueltel verbally harassed Navarre each day they worked together from early February to late April 2005.

4

The harassment included Bueltel calling Navarre "retard" and Bueltel asking whether Navarre was "fucking retarded," "fucking stupid," or "dropped on [his] fucking head."  Bueltel also hit his chest with his hand while stating:  "[D]rrrr, my name is Don Navarre.  I'm fucking retarded."  According to Navarre, the harassment continued despite his repeated objections and statements that he was disabled.  At his deposition, Bueltel disputed many of the alleged instances of harassment recounted above, but the Court assumes for present purposes that Navarre's deposition testimony is accurate.  Bueltel did acknowledge at his deposition that Navarre froze when White Castle became busy:  "If we got real busy and orders came in right after another [Navarre] would just—I don't know what happens, but from what I saw if it got real busy he would just stop and stand there or he would kneel down and just kind of sit there."  Bueltel also stated that Navarre "kind of cover[ed] his face or scratch[ed] his head or whatever he chose to do while he was down there."  According to Bueltel, Navarre then stood up and "picked up where he left off before he did his little shutdown."  Bueltel also testified:  "I asked [Navarre]—I told [Navarre] that some of the stuff [he] do[es] sometimes seems like [he] just come[s] to work and [he] leave[s] [his] mind or [his] concentration or mind at home."  Viewing the record in the light most favorable to Navarre, a reasonable factfinder could find that Navarre was regarded as having impairments that substantially limited the major life activities of thinking and concentrating.[1]  *See Shaver*, 350 F.3d at 720-21 (concluding that a jury could find plaintiff disabled where plaintiff's co-workers regarded him as "stupid" and "not playing with a full deck" because of his nocturnal epilepsy and operation in which a metal plate replaced part of his brain); *cf. Costello v. Mitchell Public Sch. Dist. 79*, 266 F.3d 916, 924 (8th Cir. 2001) (concluding that teacher calling student "retarded," "stupid," and "dumb" did not raise genuine

---

[1]  In light of this conclusion, the Court need not consider at this time whether Navarre could satisfy other definitions of disability.

5

issue of material fact on issue of whether school district and personnel regarded student as disabled where evidence showed defendants treated plaintiff "as if she was [a] student without a substantially limiting impairment").

White Castle does not dispute for present purposes that Navarre experienced unwelcome harassment. In addition to the verbal harassment summarized above, Bueltel allegedly harassed Navarre by pushing him and threatening to punch him. According to Navarre's deposition testimony, Bueltel occasionally used his body to push Navarre three or four feet away when Bueltel was upset with Navarre. On one occasion, Bueltel shoved Navarre to the ground. Bueltel also threatened to punch Navarre on a few occasions. At his deposition, Bueltel denied threatening to punch Navarre or pushing Navarre. Bueltel acknowledged that he might have bumped Navarre while "trying to squeeze" into a grill area.

As to whether the unwelcome harassment allegedly experienced by Navarre resulted from his disability, White Castle argues that there is no evidence that Bueltel "meant his use of words like 'idiot' and 'retarded' literally, rather than as derisive terms expressing general impatience" and that the words allegedly used by Bueltel "are so commonly used as terms of derision that they carry no natural association with an actual disability." "[T]he meaning of the statements (that is, what inference to draw from the words used) is properly a matter for the jury." *Shaver*, 350 F.3d at 721. Viewing the record in the light most favorable to Navarre, a reasonable factfinder could find that the alleged harassment resulted from Navarre's membership in the protected class. *See id.*; *Bowen v. Mo. Dep't of Social Servs.*, 311 F.3d 878, 884 (8th Cir. 2002).

White Castle next argues that the harassment allegedly experienced by Navarre was not so severe and pervasive as to create an objectively hostile work environment. *See Shaver*, 350

6

F.3d at 721. "In order to be actionable, harassment must be . . . 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). "Conduct that is merely rude, abrasive, unkind, or insensitive" is not actionable under anti-discrimination laws; the laws "do not create a general civility code." *Id.* "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

White Castle contends that the harassment allegedly experienced by Navarre is "much less extreme" than that analyzed in *Shaver*, a case in which the Eighth Circuit concluded that the harassment was not sufficiently severe to permit the plaintiff to survive summary judgment. 350 F.3d at 721-22. In *Shaver*, the plaintiff's co-workers, including supervisors, referred to the plaintiff as "platehead" over the course of two years. *Id.* at 721. Nicknames were commonly used at the plaintiff's place of employment. *Id.* Several co-workers indicated that the plaintiff was stupid. *Id.* One co-worker said that the plaintiff wet his pants "when the microwave was on." *Id.* The Eighth Circuit concluded that the verbal harassment did not "rise to the same level as that in cases where we have granted relief." *Id.* In support, the Eighth Circuit distinguished several cases, noting that the harassment did not require the plaintiff to seek psychological treatment, that the harassment was not threatening, and that the harassment did not involve physical conduct. *Id.* at 721-22. In this case, Bueltel allegedly subjected Navarre to verbal harassment each day that they worked together over the course of approximately three months. In addition, Bueltel allegedly subjected Navarre to occasional threats and physical harassment.

7

Viewing the record in the light most favorable to Navarre, a reasonable factfinder could conclude that the harassment described in the record was so severe as to affect the terms, conditions, or privileges of his employment. *See Bowen*, 311 F.3d at 885; *cf. Shaver*, 350 F.3d at 721-22.

Finally, White Castle contends that it took prompt, appropriate, and effective remedial action. White Castle "is vicariously liable for harassment by its supervisory personnel unless it can establish that (1) [it] exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) [Navarre] unreasonably failed to take advantage of the preventive or corrective opportunities provided by [White Castle]." *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1195 (8th Cir. 2006); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998). In *Jackson v. Arkansas Department of Education, Vocational & Technical Education Division*, 272 F.3d 1020 (8th Cir. 2001), the Eighth Circuit concluded that an employer had satisfied the first prong by activating its anti-harassment policy and contacting the victim to ensure that the harassment had ended:

> Upon notification of [the supervisor's] improper behavior, the [employer] immediately activated its anti-harassment prevention policy to investigate [the plaintiff's] complaint and to avoid any situation in which [the supervisor] might repeat the behavior. The [employer] conscientiously solicited [the plaintiff] to ensure that the harassment had ended and encouraged her to inform her supervisors if the harassment continued. As a result, we agree with the district court that the undisputed facts show that the [employer] acted promptly and effectively to remedy the past sexual harassment and to avoid any future incidents, thus satisfying the first prong of the affirmative defense articulated in *Faragher*.

*Jackson*, 272 F.3d at 1025-26.

Like the employer in *Jackson*, White Castle had a "No Harassment Policy" and informed Navarre of it before his employment started. The policy expressly prohibits disability harassment, directs employees to report harassment to any one of several managers, and promises a prompt and thorough investigation of all claims of harassment. As part of its

8

investigation, White Castle "will meet with the complaining [employee] to discuss the complaint and the results of the investigation and, where appropriate, review the proposed resolution of the matter." Notwithstanding the policy, there is evidence in the record that White Castle did not interview Navarre after his report, that White Castle did not inform Navarre of the results of its investigation, that White Castle did not solicit Navarre to determine whether the harassment had ended, and that the harassment continued until Navarre's final day of employment. Viewing the record in the light most favorable to Navarre, a reasonable factfinder could conclude that White Castle did not exercise reasonable care to prevent and promptly correct Bueltel's alleged harassment of Navarre. *Cf. id.* For these reasons, the Court concludes that White Castle is not entitled to summary judgment on Navarre's ADA claim for disability harassment.

   2.  *Retaliation*

White Castle asserts that it is entitled to summary judgment on Navarre's retaliation claim under the ADA because he cannot establish a prima facie case of retaliation. *See* 42 U.S.C. § 12203 (2000). To make his prima facie case of retaliation, Navarre "must show (1) he engaged in protected conduct, (2) a reasonable employee would have found the challenged retaliatory action materially adverse, and (3) the materially adverse action was causally linked to the protected conduct." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007); *see Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007).

White Castle contends that Navarre did not engage in protected conduct. At his deposition, Navarre testified that he informed Westermann of the harassment allegedly committed by Bueltel. Viewing the record in the light most favorable to Navarre, a reasonable factfinder could conclude that Navarre engaged in protected conduct. *See Sallis v. Univ. of Minn.*, 408 F.3d 470, 477 (8th Cir. 2005).

White Castle next argues that it did not engage in any retaliatory action that a reasonable person would have found materially adverse. A materially adverse action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). Navarre asserts that White Castle engaged in two retaliatory actions that were materially adverse: (1) Nieman allegedly asked Navarre why he went "home crying to [his] mommy"; and (2) White Castle scheduled Navarre to work the second shift. Nieman's comment falls far short of a materially adverse action. *See id.* ("And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."). As to the change to Navarre's schedule, it might be materially adverse depending on the circumstances. *See id.* Here, however, the change to Navarre's schedule took place after he had tentatively agreed to "try" the second shift. Viewing the record in the light most favorable to Navarre, a reasonable factfinder could not conclude that the change to Navarre's schedule was materially adverse. *See Fenney v. Dakota, Minn. & E. R.R.*, 327 F.3d 707, 717 (8th Cir. 2003).

Even if the change to Navarre's schedule were materially adverse, White Castle argues that the assignment to the second shift "was offered to [Navarre] as a supportive, not punitive alternative." A plaintiff must demonstrate that the employer's retaliatory motive played a part in the materially adverse action to establish a causal link between the protected conduct and the materially adverse action. *Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002). Here, there is evidence in the record that a retaliatory motive did not play a part in White Castle's decision to schedule Navarre for the second shift. After learning of Bueltel's alleged harassment of Navarre, Westermann suggested that Navarre move to the second shift to separate him from his alleged harasser,

10

Bueltel. Navarre tentatively agreed to the shift change, and White Castle scheduled him accordingly. Navarre later expressed his unwillingness to work the second shift to Westermann, who allegedly responded that his decision was "okay." Navarre left White Castle a short time later without working the second shift. Navarre points to Nieman's reaction to the telephone call made by his mother and Nieman's statement to him about "crying to his mommy" in an effort to demonstrate the requisite causal connection, but Navarre has not demonstrated how Nieman's alleged irritation with Navarre's mother played a part in White Castle's decision to schedule him on the second shift. *See Gartman v. Gencorp, Inc.*, 120 F.3d 127, 131 (8th Cir. 1997) (stating that inference of causation is not supported by stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process). Viewing the record in the light most favorable to Navarre, a reasonable factfinder could not conclude that a retaliatory motive played a part in White Castle's decisions to schedule Navarre on the second shift. For these reasons, the Court dismisses Navarre's claim under the ADA for retaliation.

    *3.    Constructive discharge*

White Castle contends that Navarre has no basis to claim a constructive discharge. "A constructive discharge occurs 'when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.'" *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006). "A constructive discharge take place only when a reasonable person would find working conditions intolerable." *Id.* An employee who quits without giving the employer a reasonable chance to remedy a problem is not constructively discharged. *Id.*

According to White Castle, Navarre did not experience conditions that a reasonable person would find intolerable. Navarre responds that Bueltel's treatment of him, Nieman's rude comments about his mother, and the shift change amount to a constructive discharge. The Court

11

acknowledges that Navarre allegedly experienced offensive working conditions. Nevertheless, viewing the record in the light most favorable to Navarre, a reasonable factfinder could not conclude that his working conditions were intolerable. *See Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 910 (8th Cir. 2003); *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998). The Court therefore dismisses Navarre's claim under the ADA for constructive discharge.

### 4. *Failure to accommodate*

Discrimination under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case of a claim under the ADA for failure to accommodate, the plaintiff must show: (1) he has a disability within the meaning of the ADA; (2) he is a qualified individual; and (3) he experienced an adverse employment action as a result of the disability. *Huber v. Wal-Mart Stores, Inc.*, No. 06-2238, 2007 WL 1544134, at *2 (8th Cir. May 30, 2007); *Fenney*, 327 F.3d at 711. Assuming without deciding that Navarre can establish that he is actually disabled instead of regarded as disabled, the Court concludes that White Castle is entitled to summary judgment on this claim. *See Christensen*, 481 F.3d at 1091 & n.2 (stating definitions of actually disabled and regarded as disabled are mutually exclusive); *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999) (holding plaintiffs regarded as disabled are not entitled to reasonable accommodations).

Navarre's claim for failure to accommodate rests on White Castle's decision to schedule him on the second shift. As noted above, White Castle scheduled Navarre to work the second shift after he had tentatively agreed to "try" it, and Navarre left White Castle before the schedule

12

change took place. Thus, Navarre cannot demonstrate that White Castle failed to accommodate him.[2] *See Fenney*, 327 F.3d at 717; *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 734-35 (5th Cir. 1999). The Court therefore dismisses Navarre's claim under the ADA for failure to accommodate.

**B.    MHRA**

The parties identify a few differences between the ADA and the MHRA, but the differences do not warrant divergent conclusions with respect to Navarre's claims under the statutes. Accordingly, the Court denies White Castle's motion as it relates to Navarre's claim under the MHRA for disability harassment, *see Wenigar v. Johnson*, 712 N.W.2d 190, 205-07 (Minn. Ct. App. 2006), but grants the motion on the remaining MHRA claims. *See Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1032 n.5 (8th Cir. 2005); *Fenney*, 327 F.3d at 711 n.5.

**C.    Assault and battery**

White Castle moves for summary judgment on Navarre's claims of assault and battery. Navarre responds by agreeing to dismiss the claims with prejudice. The Court therefore grants White Castle's motion on these claims.

---

[2]    Navarre implies that White Castle could have reasonably accommodated him by leaving him on the third shift and transferring Bueltel to a different shift. Several courts of appeals have deemed similar proposals unreasonable. *See Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122-23 (2d Cir. 1999) (presuming that a request to change supervisors is unreasonable); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (remarking that employee's request to transfer to a different prison facility where he would not be harassed was unlikely to be reasonable); *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) ("[B]y asking to be transferred away from individuals who cause him prolonged and inordinate stress, [plaintiff] is essentially asking this court to establish the conditions of his employment, most notably with whom he will work. However, '[n]othing in the ADA allows this shift in responsibility.'"); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) ("[Plaintiff's] solution is that she return to work under a different supervisor. But that decision remains with the employer. In essence, [plaintiff] asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility.").

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. White Castle's Motion for Summary Judgment [Docket No. 25] is GRANTED IN PART and DENIED IN PART.

2. With the exception of Navarre's claims under the ADA and the MHRA for disability harassment, Navarre's Amended Complaint [Docket No. 21] is DISMISSED WITH PREJUDICE.

Dated:  June 14, 2007

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge